IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **MARGARET A. GROTTS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.** 14-cv-931-CJP[1] |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM and ORDER

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Margaret Grotts is before the Court, represented by counsel, seeking judicial review of the final agency decision denying her Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff initially applied for DIB and SSI on August 26, 2009. In both applications, she alleged disability beginning on January 1, 2007. (Tr. 109-11, 263). Administrative Law Judge (ALJ) Ayrie Moore held the first evidentiary hearing on July 6, 2011. (Tr. 70, 115). ALJ Moore issued an unfavorable decision on August 23, 2011. (Tr. 112-131). Plaintiff requested a review and on October 22, 2012 the Appeals Council remanded the case back to the ALJ. (Tr. 135-35).

---

[1] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c).  See, Doc. 12.

On May 22, 2013, a remand hearing was held before ALJ James Craig. (Tr. 34-62). After the hearing, ALJ Craig denied the application in a decision dated June 19, 2013, 2013. (Tr. 17-28). Plaintiff's second request for review was denied by the Appeals Council, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

### **Issues Raised by Plaintiff**

Plaintiff raises the following points:

1. The ALJ erred in forming plaintiff's credibility determination.

2. The ALJ erred in determining plaintiff's residual functional capacity ("RFC") by failing to appropriately consider medical opinion evidence.

3. The ALJ's decision was not supported by substantial evidence.

### **Applicable Legal Standards**

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[2]  For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. §423(d)(1)(A).**

---

[2] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.  The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.  As is relevant to this case, the DIB and SSI statutes are identical.  Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

***Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4)

whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20 C.F.R. §§ 404.1520;** ***Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009);** ***Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).**  See also, ***Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001**) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.  It is important to recognize that the scope of review is limited.  "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g)**.  Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but

whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.  See**, Books v. Chater, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing **Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995)**).

The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." **Richardson v. Perales, 402 U.S. 389, 401 (1971).**  In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997)**.  However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, **Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

## The Decision of the ALJ

ALJ Craig followed the five-step analytical framework described above. He determined plaintiff had not been engaged in substantial gainful activity since the date of her application He found that plaintiff had severe impairments of bipolar disorder, anxiety disorder, and hearing loss. The ALJ determined these impairments do not meet or equal a listed impairment. (Tr. 19).

The ALJ found plaintiff had the residual functional capacity (RFC) to perform work at all exertional levels but with mental limitations. (Tr. 21). Based on the testimony of a vocational expert, the ALJ found that plaintiff was unable to

perform her past work. However, she was not disabled because she could perform work that exists in significant numbers in the regional and national economies. (Tr. 26-28).

## The Evidentiary Record

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

### 1. Agency Forms

Plaintiff was born on January 13, 1978 and was twenty-eight years old on her alleged onset date. (Tr. 263). Plaintiff was five feet five inches tall and weighed one hundred and eighty-nine pounds. (Tr. 266). She was insured for DIB through June 30, 2009. [3] (Tr. 263).

Plaintiff claimed that post-traumatic stress disorder, depression, heel spurs, and migraines limited her ability to work because she was unable to concentrate or stand for long periods of time. (Tr. 267). She took Abilify for her mood disorder, Lamictal for insomnia, Tylenol for migraines, and Buspar, Congentin, Wellbutrin, and Zoloft for depression. (Tr. 271, 289). Plaintiff completed high school in 1997 and attended special education classes. (Tr. 271-72). She took classes to become a certified nurse assistant ("CNA") twice but failed to pass the state test. (Tr. 272). She stated that she previously worked as a

---

[3] The date last insured is relevant to the claim for DIB, but not the claim for SSI.  See, 42 U.S.C. §§ 423(c) & 1382(a).

bottle packager, caregiver, cook, housekeeper, janitor, laborer, nurse's aide, and personal assistant. (Tr. 268).

In November 2009, plaintiff completed a function report. (Tr. 305-11). On a daily basis, plaintiff dropped off and picked up her son from school, watched television, performed household chores, and bathed herself. (Tr. 305). Her husband and son helped prepare dinner. (Tr. 306). She did not go outside often but she was able to drive and went to the store about once a month for food. (Tr. 308).

Plaintiff claimed she had difficulty squatting, bending, walking, kneeling, climbing stairs, remembering, completing tasks, concentrating and understanding. She stated that when walking or climbing stairs she gets tired easily. She also stated she was easily side-tracked and her memory was poor. (Tr. 310). She felt she could follow written instructions well and had no problems with authority figures. (Tr. 310-11).

### 2. Evidentiary Hearing

Plaintiff was represented by counsel at the evidentiary hearing on May 22, 2013. (Tr. 36). She lived with her husband and twelve year old son. Her husband worked outside the home in an oil field and her son was developmentally disabled. (Tr. 38, 51). She had a medical card and had not worked since 2009. (Tr. 38-39). She took certified nursing assistant (CNA) classes twice but never passed the final exam. (Tr. 50).

Plaintiff testified that the last time she worked was through Illinois' Department of Rehabilitation Services ("DORS"). She babysat a friend's son while the mother was out of the house. (Tr. 39). She performed this job twenty hours a week but the job ended because she was often late or did not show up. (Tr. 39, 42). She lost previous jobs for similar reasons. (Tr. 42). While she never had a full time job, she packaged bottles in a factory thirty hours a week through a temporary placement agency. (Tr. 40). She never used a computer as part of her work. (Tr. 50).

Plaintiff felt she could not work at the time of the hearing because of her depression. She testified that up to three times a week she could not leave her home and stays in bed with the curtains drawn. (Tr. 43). On her bad days she did not listen to music or watch television, she could sleep up to ten hours, and she had difficulty concentrating. (Tr. 44-46). On her good days she could help pay bills and making sure everyday tasks, like laundry and cooking, were completed. (Tr. 46, 48).

Plaintiff took her medications for bipolar disorder, anxiety, and sleep as prescribed. (Tr. 40, 48). She had received mental health treatment for four or five years and her psychiatrist prescribed her medications. (Tr. 41). Her medications were frequently changed to alleviate side effects or increase effectiveness. (Tr. 49). She also lost some hearing in her left ear due to nerve damage but did not have a hearing aid. (Tr. 41).

A vocational expert (VE) also testified. The ALJ asked the VE a hypothetical where he was to assume a person with plaintiff's education and vocational background with limitations of no noisy environments greater than moderate, no dangerous moving mechanical parts, and no detailed or complex instructions. Additionally, the person could have no contact with the public to complete the work process, only occasional intermittent contact with co-workers and supervisors, the work would need to be three steps or less with no fast pace or strict quotas. Finally, the work should be thing oriented work instead of working with people or data. (Tr. 55-57).

The VE testified that this person would be unable to perform plaintiff's previous work. (Tr. 57). However, a significant number of jobs existed in the local and national economy at the light and sedentary exertional levels. Examples of such jobs are cloth stock sorter, surveillance system monitor, and conveyer line bakery worker. (Tr. 56-57). The VE testified that if the person missed three or more days a month, had to leave the work station two or three times a day to rest, or was off task ten percent of the average day they would be unable to perform any work. (Tr. 58-61).

### 3. Medical Evidence

Plaintiff began receiving counseling for mental health treatment at Community Resource Center in 2006. (Tr. 477, 534). She complained that she was depressed due to her husband's abuse towards her. (Tr. 477-78). She reported loss of appetite, sleep problems, anger and aggression towards her

husband, as well as feeling anxious and depressed. (Tr. 487). Plaintiff stated that she attempted to slit her wrists once in 2001. (Tr. 488). She was initially diagnosed with moderate and recurrent major depressive disorder and assigned a GAF score of 50.[4] (Tr. 491).

In 2007, plaintiff also began receiving psychiatric treatment from Janet Merrell, APN, BC. Her chief complaint was depression due to mental abuse received from her husband. (Tr. 394). Ms. Merrell diagnosed plaintiff with recurrent major depressive disorder, post-traumatic stress disorder, and a GAF score of 50. (Tr. 395).

Thereafter, plaintiff regularly received both group and individual counseling services from Community Resource Center and Ms. Merrell. (Tr. 351-77, 390-421, 422-44, 477-622, 625-59, 723-31, 790-824, 884-95). The longest plaintiff ever went without receiving treatment was from May to August 2008. (Tr. 560-561). She continually reported being unable to participate in normal daily activities on bad days, feeling anxious and depressed, difficulty sleeping, marital problems, and low self-esteem. (*Ex*, Tr. 356, 374, 396, 429, 560, 724, 790, 892).

The record indicates that plaintiff was prescribed Lamictal, Celexa, Zoloft, Wellbutrin, Abilify, Norco, Phenergan, Buspar, Cogentin, Inderal, Ciprodex, and Trazodone throughout her course of treatment. (*Ex*., Tr. 518, 681, 736, 746, 761,

---

[4] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

772, 893). Ms. Merrell changed the dosages and types of medication twenty-three times on record due to side effects and the effectiveness of the medications. (*Ex*, Tr. 397, 417, 612, 653, 654, 729, 731, 824, 893). The record indicates plaintiff had side effects of fatigue, jitteriness, nausea, forgetfulness, extrapyramidal symptoms, and hand tremors. (Tr. 356, 362, 368, 398, 614, 616, 620).

### 4. Disability Application

In December 2012, an application for an Illinois disabled person identification card was completed by Dr. Judy Keevan and plaintiff's counselor Janet Merrell. (Tr. 875-76). They stated plaintiff had a "class 2" mental disability. The form defined a class 2 disability as

> [A]ny type of disability which renders a person unable to engage in any substantially gainful activity, or which substantially impairs the person's ability to live independently without supervision or in-home support services, or which substantially impairs the person's ability to perform labor or services for which he/she is qualified or significantly restricts the labor or services which he/she is able to perform.

The form did not provide a place for the doctor or counselor to explain their reasoning for this classification. (Tr. 875-76).

### 5. Treating Counselors' Opinions

Plaintiff's treating counselors completed two mental functional capacity reports. (Tr. 623-624, 899-900). The first report was signed by one of plaintiff's counselors in November 2010 and cosigned by another counselor in December 2010. The counselors' diagnoses were bipolar disorder and generalized anxiety disorder. They felt plaintiff had marked limitations in activities of daily living and

social functioning. They also opined that plaintiff had extreme limitations in concentration, persistence, and pace. (Tr. 623). The counselors stated that plaintiff had one to two episodes of decompensation in the last twelve months and plaintiff would be absent from work more than three times a month due to her impairments. (Tr. 624).

In May 2013, two of plaintiff's treating counselors, Mikealla Walker and Janet Merrell, completed the second mental functional capacity report. (Tr. 899-900). Their diagnoses were bipolar disorder, generalized anxiety disorder, and a GAF score of 43. They opined that plaintiff had marked limitations in her activities of daily living and concentration, persistence, and pace. The counselors indicated plaintiff had extreme limitations in social functioning. (Tr. 899). They indicated plaintiff had four or more episodes of decompensation in the last twelve months and she would miss work more than three times a month due to her impairments. (Tr. 900). Mikaella Walker also wrote a letter that reiterated her opinions in the report. (Tr. 901).

### 6. Consultative Examination

In January 2010, plaintiff saw state agency psychologist Fred Klug for a psychological consultative examination. Dr. Klug opined that plaintiff was alert and fully oriented. (Tr. 475). Plaintiff's attention span was adequate and her concentration was fair. Her immediate memory was varied, short-term memory was intact with encoding deficits, and long-term memory was intact. Plaintiff's fund of knowledge was very restricted, and her reasoning, ability to do simple

calculations, abstract thinking, insight, and judgment were poor. Dr. Klug felt plaintiff's intellectual functioning appeared borderline. His diagnostic impressions were dysthymic disorder- late onset and generalized anxiety disorder. (Tr. 473-76).

### 7. RFC Assessments

In February 2010, plaintiff had physical and mental residual functional capacity (RFC) assessments performed. The state agency psychologist and physician reviewed plaintiff's records but did not examine plaintiff in person. Dr. Jerrold Heinrich performed plaintiff's mental RFC assessment and felt that plaintiff was moderately limited in her ability to carry out detailed instruction, maintain attention and concentration for extended periods, and respond appropriately to changes in the work setting. (Tr. 445-46). He felt plaintiff was also moderately limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 445).

Dr. Richard Bilinsky performed plaintiff's physical RFC assessment. He opined that plaintiff could occasionally lift fifty pounds, frequently lift twenty five pounds, and stand, walk, or sit for six hours in an eight hour day. Plaintiff was limited in her ability to push and pull with her lower extremities because of left heel pain. (Tr. 450). Plaintiff could never climb ladders, ropes, or scaffolds, and could only occasionally climb ramps and stairs. Dr. Bilinsky opined that plaintiff

could occasionally balance and frequently stoop, kneel, crouch, or crawl. (Tr. 451). Finally, plaintiff should avoid concentrated exposure to noise. (Tr. 453).

### Analysis

Plaintiff argues that the ALJ erred in his credibility assessment, RFC determination, and did not have substantial evidence to support his decision. As plaintiff relies in part on her testimony, the Court will first consider her argument regarding the ALJ's credibility analysis.

Plaintiff points out that the ALJ used the boilerplate language that has been criticized in cases such as ***Minnick v. Colvin, 2015 U.S. App. LEXIS 249 (7th Cir. 2015), Parker v. Astrue***, **597 F.3d 920 (7th Cir. 2010), and** ***Brindisi v. Barnhart***, **315 F.3d 783 (7th Cir. 2003).** However, the use of the boilerplate language does not necessarily require remand. The use of such language is harmless where the ALJ goes on to support his conclusion with reasons derived from the evidence. **See,** ***Pepper v, Colvin***, **712 F.3d 351, 367-368 (7th Cir. 2013);** ***Shideler v. Astrue***, **688 F.3d 306, 310-311 (7th Cir 2012).**

It is well-established that the credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. ***Powers v. Apfel***, **207 F.3d 431, 435 (7th Cir. 2000).** "Applicants for disability benefits have an incentive to exaggerate their symptoms, and an administrative law judge is free to discount the applicant's testimony on the basis of the other evidence in the case." ***Johnson v. Barnhart***, **449 F.3d 804, 805 (7th Cir. 2006).**

The ALJ is required to give "specific reasons" for his credibility findings. ***Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).** It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. ***Ibid***. See also, ***Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009)**(The ALJ "must justify the credibility finding with specific reasons supported by the record."). If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. ***Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).**

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

The ALJ first considered plaintiff's work history. The ALJ stated that plaintiff had a poor reported work history prior to her alleged onset date and this worked against her credibility. (Tr. 23). The Seventh Circuit has held that sporadic work history and declining earnings prior to the alleged onset date may show a lack of effort to find work and diminish a claimant's credibility. ***Simila v. Astrue*, 5730 F.3d 503, 520 (7th Cir. 2009).** However, this is the only factor that the ALJ appropriately considered and as a result his credibility determination cannot be upheld.

The ALJ stated his second reason for finding plaintiff was less than credible was her ability to complete CNA training. He opined that this was an indication she was capable of performing simple, routing tasks. (Tr. 23). Elsewhere in the opinion, the ALJ also stated that her ability to attend training for work of this nature proved she retained greater ability than she suggested in concentration, persistence, and pace. (Tr. 22).

Even though plaintiff took two CNA courses, she never successfully completed the program. She had to withdraw from the class the first time she took it because she was failing and the second time she was unable to pass the examinations. (Tr. 360, 362, 549, 552). The ALJ does not mention this portion of the record in his analysis. While plaintiff failing her exams does not indicate that she is unable to work, it does show that she was potentially more limited than the ALJ revealed in his analysis.

In analyzing the evidence, the ALJ is not permitted to "cherry-pick" the evidence, ignoring the parts that conflict with his conclusion. ***Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009).** While he is not required to mention every piece of evidence, "he must at least minimally discuss a claimant's evidence that contradicts the Commissioner's position." ***Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).** Here, ALJ Craig impermissibly "cherry-picks" portions of the record to indicate she was less than credible by failing to discuss her difficulties completing CNA training.

Finally, the ALJ stated that plaintiff's conservative treatment history was "not consistent with what would be anticipated from an individual who was unable to perform basic work functions." (Tr. 24). He reasoned that she had no noted hospitalizations or restrictive medication regimens. (Tr. 23). The ALJ errs here in two primary ways.

First, the ALJ does not explain what type of treatment history *would* be anticipated from an individual who was unable to perform basic work functions. Plaintiff saw several mental health professionals on a frequent basis. They prescribed her multiple different psychotropic medications to help her deal with the symptoms of her mental illnesses. (*Ex.*, Tr. 518, 681, 736, 746, 761, 772, 893). These mental health professionals provided opinions that plaintiff had experienced several episodes of decompensation and was incapable of work. (Tr. 623-624, 899-900.). They never indicated that plaintiff was exaggerating her symptoms or that any other treatment would be appropriate.

While the ALJ was not required to give these opinions weight or find them credible, he was required to have sound reasoning for his conclusions.  The Seventh Circuit has held that an ALJ cannot "play doctor" by substituting his own judgment for that of a physician without relying on other medical evidence or authority in the record. ***Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).** ALJ Craig does just that when he concludes that plaintiff's treatment history was not what would be expected if she had the limitations she alleged. No

medical opinions support his assumption and without further explanation and justification it is error.

Second, the ALJ does not explain what he considers a restrictive medication regimen. In fact, he only peripherally discusses plaintiff's medications at all when he discussed a consultative examiner's report. As plaintiff notes, the ALJ does not mention the types, dosages, side effects, or the effectiveness of the medications she took on a regular basis. Over the course of her treatment, plaintiff took Lamictal, Celexa, Zoloft, Wellbutrin, Abilify, Norco, Phenergan, Buspar, Cogentin, Inderal, Ciprodex, and Trazodone. (*Ex*., Tr. 518, 681, 736, 746, 761, 772, 893). The dosages and types of medication were changed over twenty times in the course of treatment. (*Ex*, Tr. 397, 417, 612, 653, 654, 729, 731, 824, 893). Her medications were changed six times after the consultative examination the ALJ mentions. (Tr. 614-21, 652-55). She reported side effects of fatigue, jitteriness, nausea, forgetfulness, extrapyramidal symptoms, and hand tremors. (Tr. 356, 362, 368, 398, 614, 616, 620). The ALJ ignored this entire line of evidence which is error. *Terry,* **580 F.3d 477.**

The Commissioner correctly cites the Seventh Circuit's opinion in ***Pepper v. Colvin*** where it was explained that an "ALJ's credibility determination may be overturned only if it 'patently wrong.'" **712 F.3d 367**. However, the Seventh Circuit has also held that "when a credibility finding rests on 'objective factors or fundamental implausibilities,' rather than on a claimant's demeanor or other subjective factors, we have greater leeway to evaluate the ALJ's determination."

*Bates v. Colvin*, **736 F.3d 1093, 1098 (7th Cir. 2013)., citing *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir 2013).** As stated above ALJ Craig did not adequately address the evidence in opposition to his opinion, he misstated the record, and he failed to fully explain his conclusions.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." ***Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).** ALJ Craig simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." ***Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012)., citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other points, but, the determination of the weight to be given to plaintiff's treating counselors' opinions and of plaintiff's RFC will require "a fresh look" after reconsideration of plaintiff's credibility. ***Pierce v. Colvin,* 739 F.3d 1046, 1051 (7th Cir. 2014).**

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Margaret Grotts's application for social security disability benefits is **REVERSED and REMANDED** to the

Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence <u>four</u> of **42 U.S.C. §405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:  January 8, 2016.**


<u>**s/ Clifford J. Proud**</u>
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**